*53 OPINION OF THE COURT
Gloria Cohen Aronin, J.
The above-entitled matter was tried before this court without a jury September 8 through 13,1982, and evidence was presented by both parties. Thereafter, memoranda of law and proposed findings of fact and conclusions of law were submitted by the parties.
The complaint alleges two causes of action, one for an account stated and one for goods sold and delivered, both in the amount of $6,733.35. The answer asserts a general denial, an affirmative defense of payment and two counterclaims. The first counterclaim is for overcharges made by plaintiff and paid by defendant during the previous 10-year period in the amount of $65,000. The second counterclaim is for the knowing and willful overcharge in a like amount. The second counterclaim seeks exemplary damages in the amount of $50,000.
Plaintiff failed to reply to the counterclaims. The defendant, in its bill of particulars, claimed damages only for the time period 1980 and 1981, and the evidence offered on trial was also limited to that time period.
FINDINGS OF FACT
The plaintiff, Wayne County Vinegar & Cider Corp., is in the business of the commercial sale of vinegar and has been in business for approximately 20 years.
The defendant, Schorr’s Famous Pickled Products, Inc., is engaged in the business of the production and commercial distribution of pickles and pickle-related products and has been in business for more than 30 years.
Plaintiff continually engaged in the sale of vinegar to the defendant for a period in excess of 13 years.
Commencing in 1980, deliveries were made “as needed” on a regular basis, approximately every week. If needed sooner, a representative of defendant called for an additional delivery.
The procedure of deliveries during the period in question was as follows:
Delivery was usually made by James Ross, the driver for plaintiff Wayne County. He would fill the second compart *54 ment of his truck, of 1,034 gallon capacity, with vinegar at Standard Brands in Peekskill. He would then drive to defendant Schorr’s and ask if they required a delivery. If vinegar was required, an employee of Schorr’s would be raised by a forklift to the top of a building, where he would carry the hose across the roofs of two buildings and eventually lower it into a cylindrical vat made of wood, the top of which was about three feet below the roof. He would then notify Mr. Ross to start the pump. The vinegar continued to be pumped until the truck compartment was empty or defendant’s employee advised Mr. Ross to stop pumping because the vat was full.
Defendant’s employee would then sign a delivery receipt, stating the quantity delivered, which was returned to plaintiff’s driver. A copy was left at Schorr’s and an additional copy was mailed later. Statements of account were mailed to defendant on a regular basis.
Plaintiff’s witnesses testified that on each and every occasion that vinegar was delivered, an employee of defendant inspected the tank compartment of the truck before delivery to see if it was full, and inspected it again after delivery to see if it was empty. Defendant’s witnesses testified that, with the exception of the last delivery, no employee of defendant Schorr’s ever, to their knowledge, inspected the truck’s tank. The court finds that such inspection was not generally made. However, some form of inspection was necessarily made by the defendant’s employee on the roof, who saw the vat, the extent to which it was filled prior to delivery and the point at which it was full to capacity. (There was contradictory testimony as to whether the vinegar receiving vat had a capacity of 1,200 gallons or 1,495 gallons.) Such employee was chargéd with the duty of ordering the pumping stopped if the vat was full, and was generally the employee who signed the delivery receipt.
The amount of vinegar delivered when it was less than the full truck tank was determined by the use of a gauge stick and calibration tables. The tanks were not metered. In those instances, the full truck compartment amount (1,034 gallons), which was generally pretyped onto the *55 invoice, was crossed out and replaced with the amount delivered.
Defendant paid in full all of plaintiff’s invoices rendered to defendant through September 14, 1981.
Defendant’s practice was to pay said invoices between one and three months after they were rendered.
Defendant has not paid invoices rendered by plaintiff from September 18, 1981 through December 2, 1981. Said invoices reflect deliveries of 9,656 gallons of vinegar and plaintiff requests payment of $6,733.35 due.
Defendant made its objection to the accuracy of the invoices known to plaintiff in or about November or December, 1981. Defendant claims that only 2,579 gallons of vinegar were delivered during that period for which it owes plaintiff $1,819.46.
During 1980 and 1981, plaintiff charged defendant for 41,995 and 31,560 gallons of vinegar, respectively, for which defendant fully paid the agreed amount. Defendant claims, in its counterclaim, that plaintiff charged defendant and defendant paid for 23,013 gallons of vinegar in 1980 and 15,954 gallons of vinegar in 1981 which defendant never received. By reason thereof, defendant claims plaintiff is indebted to defendant in the amount of $11,651.66, and $8,640.22, representing the cost per gallon of the vinegar allegedly sold to defendant at the time of each delivery, but in fact never delivered.
Defendant’s evidence in support of its claim of shortages in deliveries regarding both the action-in-chief and the counterclaim consisted of the introduction of its production records for that period, showing the items produced and the formulas for each product using vinegar, together with summary sheets calculating on the above basis the total amount of vinegar consumed. The testimony indicated that the calculations included one third for waste by allowing one third more vinegar per product than the average amount.
Plaintiff introduced considerable evidence as to leaks, overflows, shipment of vinegar to defendant’s New Jersey plant and other evidence of vinegar delivered but not consumed as per the production records.
*56 The court finds that the defendant did not sustain its burden of proving shortages in deliveries and the amount thereof, as appears in more detail in the conclusions of law.
CONCLUSIONS OF LAW
ACCOUNT STATED
In its action-in-chief plaintiff has failed to sustain its burden of proof for an account stated. The plaintiff’s action herein is one for goods sold and delivered and account stated regarding vinegar sold and delivered from September 18, 1981 to December 2, 1981.
An account stated arises when the parties have an agreement, express or implied, that the account reflects the amounts due on past transactions.[1] An account stated means “that the parties have come together and agreed upon the balance of indebtedness”.[2]
It may be implied by the sending of a statement by the creditor and the debtor’s failure to dispute its correctness.[3] Such failure to object raises the presumption of an agreement as to correctness, which may be rebutted.[4]
In the instant case, it was the usual practice of the parties, as appears in the testimony, that invoices were left with defendant with each delivery and bills were sent regularly. Defendant generally paid anywhere from 1 to 3 months after receipt of the bill.
With regard to the period covered by the plaintiff’s action, defendant did not pay and questioned and/or objected to the bills some time in November and/or December, 1981, as to their accuracy in amount delivered and billed for. Based on the course of dealing between the parties over an extended period of time, such objection timely and effectively rebutted the “account stated” presumption, and negated any claim of agreement between the parties as to the correctness of the account.[5]
*57 With regard to the defendant’s counterclaim to recover for alleged short deliveries by plaintiff over a period of two years, all of which transactions were billed and paid for contemporaneously to the time period of the transactions, the defense of account stated would raise a much stronger question. Where payment has been made and there has been no objection within a reasonable time, there is a strong presumption of an agreement as to the amount due, and it requires strong evidence to rebut it.[6]
There is some authority to the effect that, in spite of payment and no timely objection, there cannot be an account stated where there is deception by a seller, who has sole or much greater knowledge than is available to the buyer.[7] The court does not feel this is applicable to the instant case. Knowledge of the amount delivered was readily available to the defendant for the looking and the question of deception will be dealt with later in the decision.
The plaintiff did not specifically raise “account stated” as a defense to the counterclaim on trial. It did assert, however, that defendant’s failure to give timely notice of any shortages constituted a waiver, and prevented it from raising the question at this time. Certainly, the apparently completed transactions involved create a presumption of correctness which the defendant has the burden to rebut.[8]
UNIFORM COMMERCIAL CODE
APPLICABILITY
The transactions which form the basis for this lawsuit and counterclaim are clearly covered by the Uniform Commercial Code.
Section 2-102 of the Uniform Commercial Code provides that the Uniform Commercial Code applies to “transactions in goods”. Goods are defined as “all things * * * which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid” and including “Any agreed proportion of such a bulk [fun *58 gible] or any quantity thereof agreed upon by number, weight or other measure”.[9] The vinegar sold herein falls within the statutory definition of goods.
WAIVER — NOTICE OF BREACH
The plaintiff seller herein contends that the defendant buyer had the opportunity to inspect the goods and to reject them if the quantity was incorrect, or to accept them and notify the plaintiff of the shortages, giving the plaintiff the opportunity to cure them. The defendant failed to notify the plaintiff of any shortage within a reasonable time. Hence, contends the plaintiff, under the provisions of subdivision (3) of section 2-607 of the Uniform Commercial Code, since the defendant accepted the goods and failed to notify the plaintiff of inaccuracy within a reasonable time, and, as to the transactions covered by the counterclaim, made payment of the amount billed, the defendant has waived its rights and is estopped from raising these issues at this time.
The defendant buyer contends that since the plaintiff seller did not reply to the counterclaim, it cannot raise these questions, which may only be asserted as affirmative defenses. It further contends that the plaintiff seller is guilty of knowingly deceiving the defendant buyer and that this constitutes fraud, which takes the transaction out of the Uniform Commercial Code and overcomes any failures to act in accordance with its provisions on the part of the defendant buyer.
The following provisions of the Uniform Commercial Code are noted:
Subdivision (2) of section 2-508: “Where the buyer rejects a non-conforming tender which the seller had reasonable grounds to believe would be acceptable with or without money allowance the seller may if he seasonably notifies the buyer have a further reasonable time to substitute a conforming tender.”
Subdivision (1) of section 2-513: “Unless otherwise agreed * * * where goods are tendered or delivered or identified to the contract for sale, the buyer has a right before payment or acceptance to inspect them at any rea *59 sonable place and time and in any reasonable manner. When the seller is required or authorized to send the goods to the buyer, the inspection may be after their arrival.”
Section 2-601: “[I]f the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may
“(a) reject the whole; or
“(b) accept the whole; or
“(c) accept any commercial unit or units and reject the rest.”
Section 2-606 (subd [1], par [b]): “Acceptance of goods occurs when the buyer * * * fails to make an effective rejection * * * but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them”.
Section 2-607:
“(1) The buyer must pay at the contract rate for any goods accepted.
“(2) Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by this Article for non-conformity.
“(3) Where a tender has been accepted
“(a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy * * *
“(4) The burden is on the buyer to establish any breach with respect to the goods accepted.”
Applying the above statutes, the buyer in the instant case had the opportunity to inspect and, to some extent did inspect, and accepted the goods.[10] It therefore lost its right to reject the goods pursuant to section 2-607 of the Uniform Commercial Code.[11]
The Uniform Commercial Code provisions (§ 2-608) for revocation of acceptance are not applicable here. The defendant therefore was relegated to remedies other than *60 rejection, but only if it gave notice of breach of warranty or contract as to quality or quantity.[12] The purpose of such notice is, in part, as plaintiff alleges, to give the seller the opportunity to cure the defect.[13] Certainly, the opportunity to cure is most relevant to a case involving quantity, since shortages are generally easy to cure.[14]
This court holds that the defendant buyer did give notice of breach and therefore preserve its remedies as to the goods sold and delivered from September 18, 1981 to December 2, 1981, which are encompassed in the plaintiff’s action-in-chief. As to the deliveries for 1980 and 1981 set forth in the defendant’s counterclaim, no timely notice of breach was given and the defendant’s remedies were waived pursuant to the provisions of the Uniform Commercial Code.[15]
This interpretation of the Uniform Commercial Code is entirely in accord with its purposes and policy. Section 1-102 (subd [2], par [a]) of the Uniform Commercial Code states that its purpose is to “simplify, clarify and modernize the law governing commercial transactions” and, to make such laws uniform. The achievement of this purpose should provide consistency and certainty in commerce and encourage good business practices. Buyers and sellers are entitled to a reasonable expectation that a finality will be achieved in their business transactions at an appropriate time.
WAIVER — GENERAL DENIAL
Defendant’s position regarding plaintiff’s failure to assert waiver and estoppel as an affirmative defense will next be considered.
*61 Section 907 of the CCA states: “Pleadings; subsequent pleading containing cause of action, (a) Counterclaim. The plaintiff may reply to a counterclaim but shall not be required to do so except by court order. If the plaintiff elects voluntarily to reply, he shall do so within ten days after service of the answer containing the counterclaim. In the absence of a reply the allegations of the counterclaim shall be deemed denied by the plaintiff”.
In the instant case, the plaintiff did not reply to the defendant’s counterclaim and the defendant did not seek a court order requiring it to do so.
The statutory provision regarding affirmative defenses is as follows: CPLR 3018 (subd [b]): “Affirmative defenses. A party shall plead all matters which if not pleaded would be likely to take the adverse party by surprise or would raise issues of fact not appearing on the face of a prior pleading such as arbitration and award, collateral estoppel * * * discharge in bankruptcy, facts showing illegality either by statute or common law, fraud, infancy or other disability of the party defending, payment, release, res judicata, statute of frauds, or statute of limitation. The application of this subdivision shall not be confined to the instances enumerated.”
The waiver and estoppel defense raised herein is not one of those enumerated in the above section. It is a defense under the provisions of the Uniform Commercial Code that defendant, having accepted delivery and having failed to give notice of breach within a reasonable time, has no further remedy. As such, it is not a defense that should take the adverse party by surprise or create new issues of fact.
It is well-established law that where a party has the burden of proving a fact, a denial is sufficient to put it at issue.[16]
Pursuant to subdivisions (3) and (4) of section 2-607 of the Uniform Commercial Code it is incumbent on the buyer to prove that notice of breach was timely given in order to have any remedy against the seller after goods *62 have been accepted.[17] It has been held that to pursue a suit for damages after acceptance of goods, the buyer must both allege and prove that notice of breach was given within a reasonable time. Acceptance of goods casts the burden of proving notification of breach on the buyer.[18]
Failure to give notice in these circumstances constitutes a waiver of any objections the buyer might have had.[19] Therefore, a general denial of notice of breach and defect is sufficient to enable the seller to claim waiver.
In the instant case, defendant failed to allege timely notice of breach in its counterclaim. In view of the very liberal construction of pleading requirements in this court, that required allegation will be read into the counterclaim and thus into the deemed general denial of the plaintiff.
FRAUD
Defendant buyer also contends that the plaintiff seller acted fraudulently and that fraud removes the transaction from all terms of the Uniform Commercial Code. Section 2-721 of the Uniform Commercial Code provides that in case of fraud, all the remedies for nonfraudulent breach are available.
If there is fraud in the inducement of the contract, it has been held that the contract no longer applies. That has no possible application to these facts, where there was a lengthy, ongoing business relationship between the parties.
The availability of the Uniform Commercial Code remedies in fraud cases does not, however, preclude the buyer from asserting other remedies for fraud and the buyer may sue in tort for fraud.[20] In the instant case, the defendant did not plead its counterclaim in tort. However, in view of the *63 provisions of the Civil Court Act concerning indorsed pleadings in this court,[21] we do not consider this failure fatal, any more than it is fatal to fail to specifically allege notice of breach within a reasonable time.
However, to establish fraud as a tort requires proof of all of its elements, to wit: A representation of a material fact, the falsity of that representation, scienter, reliance, and damages. Moreover, all proof must be by clear and convincing evidence and not mere conjecture.[22] The defendant’s proof has fallen far short of this in the instant case, but the defendant contends that fraud should be inferred. The court will not infer fraud unless the evidence is unequivocal and the conclusion is inescapable.[23]
Thus, the issues are not removed from the provisions of the Uniform Commercial Code by reason of fraud.
DAMAGES
The court will consider the issues raised concerning damages although it has found the defendant to have no cause of action in its counterclaim.
The measure of damages for breach of contract or warranty regarding goods pursuant to the Uniform Commercial Code is the difference between value warranted and real value at the time and place of the warranty.[24]
In the matter at hand, if the defendant had proved breach, the damages would have been the difference between the amount paid by the defendant to the plaintiff and the amount that should have been paid for the actual amount delivered. The defendant would then have had to prove what that difference is.
On the trial herein, the defendant introduced many business records and documents in an attempt to show the amount of damage sustained by calculating the amount of vinegar actually consumed during the period in question, *64 adding an amount for waste and subtracting the sum of those from the amount of vinegar billed for. The difference times the price is claimed to be the amount of damages.
A serious question arises as to whether this proof is too speculative to assess damages on. The buyer would certainly bear the burden of proving damages beyond a mere approximation.[25]
Damages may only be allowed when there is probative evidence of the amount of damages.[26] And while, where damages cannot be precisely proved, proof upon a reasonable basis is sufficient, no damages may be awarded on a purely speculative basis.[27]
For the finder of fact to be able to draw inferences from lesser proof, the situation must be one in which the amount of damages suffered is unavoidably uncertain or difficult to ascertain and there is a definite and logical connection between the proof and the damages the court is asked to find.[28] This has, on occasion, been done by the use of a formula, as in the instant case. The courts have upheld damages established by formula only where that formula constitutes a reasonable basis and the amount of actual damage is unavoidably uncertain.[29]
Generally, this situation obtains where damages are prospective in nature, and therefore must, to some extent, be uncertain and problematical.[30]
In the instant case, the damages alleged are not prospective and would not have been uncertain had the defendant properly inspected the deliveries. In addition, the proof of damages, while voluminous and containing many business *65 records, does not establish by expert testimony or otherwise any reasonable basis for the percentage allotted to waste. The fact that defendant used a specific figure in its records as a cost basis or for any other reason does not show its logical connection to fact.
With regard to exemplary damages, they are generally not allowable unless the party against whom they are to be held has in fact committed a flagrant and malicious fraud, frequently associated with a general scheme against the public or other parties.[31] Where there have not been acts against the public, punitive damages have been allowed if the conduct proved was gross, wanton, and willful.[32]
Thus, in the instant case, even if defendant had established its cause of action for overcharges and consequential damages, there being no finding of fraud, exemplary or punitive damages would be inapplicable.[33]
With regard to the action-in-chief, the plaintiff established a prima facie case as to goods sold and delivered and account stated. As hereinbefore appears, the cause of action for account stated was rebutted by defendant’s showing of timely objection. However, with regard to the cause of action for goods sold and delivered, the defendant failed to establish any specific amount by which the goods fell short and therefore failed to overcome plaintiff’s prima facie case.
With regard to the counterclaim, the defendant was barred from any remedy under the terms of the Uniform Commercial Code. This waiver was not overcome by failure on the part of the plaintiff to assert it as an affirmative defense, nor by any finding of fraud as heretofore discussed.
Judgment for plaintiff on its action for $6,733.35 and on the counterclaim, without costs.

. Lockwood v Thorne, 18 NY 285, 288; see Harold R. Clune, Inc. v Healthco Med. Supply (Healthco, Inc.), 78 AD2d 914.

. Newburger-Morris Co. v Talcott, 219 NY 505, 512.

. Parker, Chapin, Flattau & Klimpl v Daelen Corp., 59 AD2d 375; Milstein v Montefiore Club of Buffalo, 47 AD2d 805.

. Lockwood v Thorne, 18 NY 285; Harold R. Clune, Inc. v Healthco Med. Supply (Healthco, Inc.), 78 AD2d 914; see, also, Marotta v Coratti, 76 AD2d 943.

. See Uniform Commercial Code, §§ 1-204, 1-205.

. Lockwood v Thorne, 18 NY 285; Milstein v Montefiore Club of Buffalo, 47 AD2d 805.

. Westinghouse Elec. Corp. v Lyons. 125 NYS2d 420.

. See Hart v Heilman Co., 17 AD2d 438, affd 13 NY2d 633.

. Uniform Commercial Code, § 2-105, subds (1) (4).

. Uniform Commercial Code, § 2-606.

. Miron v Yonkers Raceway, 400 F2d 112.

. Uniform Commercial Code, 8 2-607, subds (2) (3); Miron v Yonkers Raceway, 400 F2d 112; G. & D. Poultry Farms v Long Is. Butter & Egg Co., 33 AD2d 685; Beacon Plastic & Metal Prods, v Corn Prods. Co., 57 Misc 2d 634 (App Term, 1st Dept).

. Uniform Commercial Code, 8 2-605, subd (1), par (a). The official Comment suggests that if a seller could cure and buyer does not notify him of a particular objection, the buyer is probably not acting in commercial good faith (Uniform Commercial Code, 8 2-605, Comment 2; see, also, Matter of Gotham Silver Co., 91 F Supp 520, applying New York law).

. Rich’s Rest, v McFann Enterprises, 39 Col App 545.

. Uniform Commercial Code, 88 2-606, 2-607; Miron v Yonkers Raceway, 400 F2d 112; Nederlandse Draadindustrie NDI B.V. v GrandPre-stressed Corp., 466 F Supp 846 (applying New York law), affd 614 F2d 1289; Donnell & Mudge v Bonita Leather Fashions, NYLJ, Jan. 15, 1971, p 2, col 4, 8 UCC Rep Serv 699.

. 3 Weinstein-Korn-Miller, NY Civ Frac, par 3018.04.

. Nederlandse Draadindustrie NDI B.V. v Grand Pre-stressed Corp., 466 F Supp 846; G. & D. Poultry Farms v Long Is. Butter & Egg Co., 33 AD2d 685; Beacon Plastic & Metal Prods, v Corn Prods. Co., 57 Misc 2d 634.

. Donnell & Mudge v Bonita Leather Fashions, NYLJ, Jan. 15, 1971, p 2, col 4; Avant Garde, Inc. v Armtex, Inc., NYLJ, Dec. 28, 1967, p 17, col 1, 4 UCC Rep Serv 949.

. Uniform Commercial Code, § 2-607, subd (3), par (a); Nederlandse Draadindustrie NDI B.V. v Grand Pre-stressed Corp., 466 F Supp 846; G. & D. Poultry Farms v Long Is. Butter & Egg Co., 33 AD2d 685.

. American Elec. Power Co. v Westinghouse Elec. Corp., 418 F Supp 435.

. CCA, §5 902, 903.

. Van Alen v Dominick & Dominick, 441 F Supp 389, affd 560 F2d 547; Vitale v Coyne Realty, 66 AD2d 562, 567; Thor Food Serv. Corp. v Makofske, 28 Misc 2d 872.

. Altman v Casale, 25 AD2d 877; Van Alen v Dominick & Dominick, 441 F Supp 389, affd 560 F2d 547.

. Uniform Commercial Code, § 2-714, subd (2); Matter of Noreli v Kleinert’s, Inc., 57 AD2d 792.

. Donnell & Mudge v Bonita Leather Fashions, NYLJ, Jan. 15, 1971, p 2, col 4.

. Contemporary Mission v Famous Music Corp., 557 F2d 918; Duane Jones Co. v Burke, 306 NY 172.

. Eastman Kodak Co. of N. Y. v Southern Photo Materials Co., 273 US 359; Wood Gen. Trading Establishment v Coe, 297 F2d 651; Harsco Corp. v Rodolitz Realty Corp., 61 Misc 2d 644.

. Eastman Kodak Co. of N. Y. v Southern Photo Materials Co., 273 US 359; Dunkel v McDonald, 272 App Div 267, affd 298 NY 586.

. Luria Bros. & Co. v United States, 369 F2d 701; see Berley Inds. v City of New York, 45 NY2d 683 (formula held not certain).

. Alexander’s Dept. Stores v Ohrbach’s, Inc., 269 App Div 321; Wakeman v Wheeler & Wilson Mfg. Co., 101 NY 205.

. Walker v Sheldon, 10 NY2d 401.

. Borkowski v Borkowski, 39 NY2d 982; see Greenspan v Commercial Ins. Co. of Newark, N. J., 57 AD2d 387.

. Lovett v Allstate Ins. Co., 86 AD2d 545.